**RECORD NO. 16-6795**

In The

# United States Court Of Appeals

## For The Fourth Circuit

# UNITED STATES OF AMERICA,

*Petitioner – Appellee,*

v.

# HOBART J. BARRETT, JR.,

*Respondent – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
AT RALEIGH**

_____

# CORRECTED BRIEF OF APPELLANT

_____

Lawrence H. Brenner
BRENNER & BRENNER, P.A.
P. O. Box 787
Carrboro, NC 27510
(252) 349-0662

*Counsel for Appellant*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ..................................................................... iii

STATEMENT OF JURISDICTION........................................................1

ISSUES PRESENTED FOR REVIEW ...................................................2

STATEMENT OF THE CASE...............................................................3

       Statement of Facts............................................................................5

SUMMARY OF ARGUMENT ...........................................................14

ARGUMENT .......................................................................................17

       Standard of Review........................................................................17

  I.     THE DISTRICT COURT ERRED BY FAILING TO FIND
        FACTS SUPPORTING ITS CONCLUSION THAT MR.
        BARRETT DID NOT PROVE THAT HE WAS ENTITLED
        TO CONDITIONAL RELEASE, AND THUS THE CASE
        SHOULD BE REMANDED ...............................................17

  II.    MR. BARRETT'S LIBERTY INTEREST SHOULD COMPEL
        THIS COURT TO DIRECT THE DISTRICT COURT TO
        PLACE HIM DIRECTLY IN SKILLED NURSING CARE ............21

  III.   ALTERNATIVELY, THIS COURT SHOULD DIRECT THE
        DISTRICT COURT TO FASHION A RELEASE
        CONSISTENT WITH THE PLAN MR. BARRETT
        PROPOSED...........................................................................27

  IV.   THIS COURT SHOULD INSTRUCT THE COURT THAT
        MR. BARRETT'S CONTINUED CONFINEMENT
        VIOLATES HIS LIBERTY INTEREST BECAUSE IT
        OFFERS NO PATHWAY TO RELEASE THROUGH THE
        CTP......................................................................................30

CONCLUSION ....................................................................................34

REQUEST FOR ORAL ARGUMENT ................................................................36

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Bowring v. Godwin*,
  551 F.2d 44 (4th Cir. 1977) ........................................................... 31

*Eckhart v. Hensley*,
  475 F. Supp. 908 (W.D. Mo. 1979) ............................................... 31

*Flakes v. Percy*,
  511 F. Supp. 1325 (W.D. Wisc. 1981) ........................................... 30

*Foucha v. Louisiana*,
  504 U.S. 71 (1992) ......................................................................... 23

*Humphrey v. Cady*,
  405 U.S. 594 (1972) ....................................................................... 34

*Jackson v. Indiana*,
  406 U.S. 715 (1972) ....................................................................... 30

*Kansas v. Crane*,
  534 U.S. 407 (2002) ....................................................................... 28

*Kansas v. Hendricks*,
  521 U.S. 346 (1997) ....................................................................... 28

*Lake v. Cameron*,
  364 F.2d 657 (D.C. App. 1966) ..................................................... 24

*Lynch v. Baxley*,
  386 F. Supp. 378 (M.D. Ala. 1974) ............................................... 35

*Matter of Josiah Oakes*,
  8 Law Rep. 123 (Sup. Ct. of Mass., 1845) ................................... 35

*Ohlinger v. Watson*,
  652 F.2d 775 (9th Cir. 1981) ......................................................... 31

*QinetiQ US Holdings, Inc. v. Commissioner of Internal Revenue*,
   ___ F.3d ___, 2017 WL 65555 (4th Cir. 2017) ............................................ 17

*Reno v. Flores*,
   507 U.S. 292 (1993) ...................................................................................... 23

*Seattle Box Co., Inc. v. Industrial Crating and Packing, Inc.*,
   756 F.2d 1574 (Fed. Cir. 1985) .................................................................... 20

*Stachulak v. Coughlin*,
   364 F. Supp. 686 (N.D. Ill. 1973) ................................................................ 31

*United States v. Barrett*,
   491 Fed. Appx. 416 (4th Cir. 2012) ............................................................... 3

*United States v. Comstock*,
   560 U.S. 126 (2010) .............................................................................. 3, 5, 34

*United States v. Hollis*,
   424 F.2d 188 (4th Cir. 1970) ....................................................................... 20

*United States v. Salerno*,
   481 U.S. 739 (1987) ...................................................................................... 23

*United States v. Wooden*,
   2016 WL 6634920, __ F. Supp. 3d __ (4th Cir. 2016) ................................ 17

*Watson v. City of Memphis*,
   373 U.S. 526 (1963) ...................................................................................... 26

*Wolfe v. New Mexico Dept. of Human Services*,
   69 F.3d 1081 (10th Cir. 1995) ..................................................................... 19

*Wyatt v. Aderholt*,
   503 F.2d 1305 (5th Cir. 1974) ..................................................................... 31

*Wyatt v. Stickney*,
   325 F. Supp. 781 (M.D. Ala. 1971) ............................................................. 31

*Zadvydas v. INS*,
   533 U.S. 678 (2001) ...................................................................................... 23

iv

**Statutes:**

18 U.S.C. § 1848 ............................................................................5

18 U.S.C. § 3503 ..........................................................................24

18 U.S.C. § 3603 ..........................................................................24

18 U.S.C. § 3603(10) ....................................................................25

18 U.S.C. § 4243 ..........................................................................24

18 U.S.C. § 4246 ..........................................................................24

18 U.S.C. § 4247 ....................................................................*passim*

18 U.S.C. § 4247(a)(C) ................................................................30

18 U.S.C. § 4247(b) ........................................................................4

18 U.S.C. § 4247(e)(2) ................................................................30

18 U.S.C. § 4247(h) ........................................................17, 24, 25

18 U.S.C. § 4247(i)(C) ................................................................30

18 U.S.C. § 4248 ..................................................................1, 3, 4, 36

18 U.S.C. § 4248(d) ....................................................................23

18 U.S.C. § 4248(e) ..................................................................4, 24

18 U.S.C. § 4248(e)(2)(B) ..........................................................23

18 U.S.C. § 4248(f) ....................................................................23

28 U.S.C. § 1291 ............................................................................1

28 U.S.C. § 1331 ............................................................................1

**Constitutional Provision:**

U.S. Const. amend. XIV ...................................................................15

**Regulations:**

28 C.F.R. § 2.77 ...............................................................................25

28 C.F.R. § 2.78 ...............................................................................25

**Rule:**

Fed. R. Civ. P. 52(a)................................................................18, 19, 20

**Other Authorities:**

Christine Vestal "For Aging Inmates, Care Outside Prison Walls,"
Stateline, Pew Charitable Trust (Aug. 12, 2014), available at
http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2014/
08/12/for-aging-inmates-care-outside-prison-walls/ ...............................26

Martina E. Cartwright, "The Silver Tsunami: Aging Prisoners, Early Release,
Guardianship and Prisoner Advocate Initiatives for Long Term Care Beyond
the Prison Walls," Journal of Aging, Longevity, Law, and Policy (2016): Vol.
1: Iss. 1, Article 6, available at http://digitalcommons.tourolaw.edu/
jallp/vol1/iss1/6 ............................................................................ 25

Statement of Michael E. Horowitz, Inspector General, U.S. Department of
Justice, before the United States Sentencing Commission hearing on
"Compassionate Release and the Conditions of Supervision," 17 Feb. 2016,
available at http://www.ussc.gov/sites/default/files/pdf/amendment-
process/public-hearings-and-meetings/20160217/IG.pdf ........................ 25

Tina Maschi, *et al.*, "Analysis of United States Compassionate and Geriatric
Release Laws: Towards a Rights-Based Response for Diverse Elders and
Their Families and Communities," Fordham University, Evidence Press
(2015), available at https://www.prisonlegalnews.org/news/publications
/analysis-united-states-compassionate-and-geriatric-release-laws-be-
evidence-press-2015/ ......................................................................26

## STATEMENT OF JURISDICTION

The district court had jurisdiction over the civil commitment proceedings pursuant to the Adam Walsh Child Protection and Safety Act of 2006, codified at 18 U.S.C. §§ 4247-48; and federal question jurisdiction under 28 U.S.C. § 1331. Final judgment was entered on May 12, 2016; notice of appeal was filed on June 11, 2016 (J.A. 663). This Court has jurisdiction over this timely appeal filed from a final order pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

I.      Did the district court err by failing to find facts supporting its conclusion that Mr. Barrett did not prove that he was entitled to conditional release, and is remand the proper remedy for such failure?

II.      Does Mr. Barrett's liberty interest compel this Court to order the district court to place him directly in skilled nursing care?

III.      Alternatively, should this Court direct the district court to fashion a release consistent with the plan Mr. Barrett proposed?

IV.      Should this Court instruct the district court that Mr. Barrett's continued confinement violates his liberty interest because it offers no pathway to release through the CTP, Butner FCI's sexual offender treatment program?

## STATEMENT OF THE CASE

On May 18, 2007, the government certified Hobart J. Barrett. Jr. as a sexually dangerous person pursuant to the Adam Walsh Act, 18 U.S.C. § 4248. (J.A. 34). The commitment proceeding was paused pending resolution of an issue of the Act's constitutionality in *United States v. Comstock*, 560 U.S. 126 (2010). On December 1, 2011, following a hearing before the Hon. Judge Bernard A. Friedman, he was committed to civil confinement under 18 U.S.C. § 4248. (D.E. 100). The commitment order was affirmed in a *per curiam* opinion on December 20, 2012. *United States v. Barrett*, 491 Fed. Appx. 416 (4th Cir. 2012).

On August 9, 2013, Mr. Barrett filed a petition under 18 U.S.C. § 4247 for conditional release. (D.E. #146).

Pursuant to this petition, Mr. Barrett moved on October 22, 2013, for the appointment of a neuropsychologist as an independent examiner. He cited two reasons for so doing: (1) an evolving scientific understanding of psychopathy and psychopathic tendencies, (2) a due process and equal protection concern that Mr. Barrett deserved to have his mental health evaluated by a person not employed by the government, and that his lack of financial resources should not preclude his access to such a resource. (D.E. #160).

In an order dated February 11, 2014 (D.E. #175), Judge Friedman granted the motion, appointing Frank Wood, Ph.D., a psychologist with a specialty in neuropsychology, as mental health examiner pursuant to 18 U.S.C. §§ 4247(b) and 4248. Communication with Dr. Wood was limited pursuant to ¶ 5(h) of Standing Order of the Court no. 13-SO-2.

The hearing began on August 14, 2014. (J.A. 144). By order of the following day, the court adjourned the hearing to allow a 30-day period in which it would accept briefing on the issue of whether it had the authority to conditionally discharge Mr. Barrett under § 4247 pursuant to 18 U.S.C. § 4248(e). The court determined that it would hear argument on this jurisdictional issue by telephone on Wednesday, October 1, 2014. (D.E. #211).

Having considered the briefing of the parties and concluded that it did have jurisdictional authority to release Mr. Barrett under § 4247, the court conducted the telephone hearing on October 2, 2014, and the following day it issued an order denying the petition without prejudice. The order granted Mr. Barrett the ability to "renew the motion at any time after the formulation of a release plan consistent with the Court's opinion on the record." The court also ordered the Bureau of Prisons to "assist [Mr. Barrett's] counsel with the establishment of a release plan consistent with the Court's opinion on the record." (D.E. #221).

4

On May 12, 2016, Mr. Barrett returned to court to renew his petition with a revised release plan. (J.A. 344). Following a full hearing on that date, Judge Friedman issued a bench decision denying the petition with prejudice. (D.E. # 299; J.A. 662).

Notice of appeal was submitted on June 11, 2016. (J.A. 663).

### Statement of Facts

Hobart Barrett Jr. is a seriously ailing 70-year-old man (J.A. 484) who was certified as a sexually dangerous person under the Adam Walsh Act on May 18, 2007 (J.A. 34-36), one day before the date of his projected release from FCI Butner. After a lapse of time pending the resolution of the Act's constitutionality under *United States v. Comstock*, 560 U.S. 126 (2010), he was committed to civil confinement under 18 U.S.C. § 1848 on December 1, 2011. (D.E. #100).

In 1963, as a juvenile, he was arrested and convicted of deliberate stabbing with intent to kill or wound a female. (J.A. 735).

In April 1968, in Ohio, he pled guilty to one count of assault with intent to rape a minor female and was sentenced to 1-15 years in prison. (J.A. 733). He was released in 1978. (J.A. 736).

In October 1989, he pled guilty to a charge of unlawful imprisonment of a minor female and was sentenced to one year in state prison. This offense is cited as the basis for his classification as a sex offender under the Act. (J.A. 733).

In November 1991, he pled guilty to kidnapping a young girl (age 5). His sentence of life imprisonment was overturned on appeal. Subsequently in March 1993, he entered into a plea agreement under which he would not be charged as a career criminal but was sentenced to 170 months' imprisonment and five years of supervised release. The plea agreement included a sentencing enhancement related to the nature of the crime and the age of the child. (J.A. 734). He was incarcerated in FCI Manchester, Kentucky. (J.A. 735).

In November 2003, while on supervised release, he was accused of various sexual offenses, resulting in his reincarceration in Manchester (J.A. 736-37), and subsequently he was transferred to FCI Butner. His projected release date was May 19, 2007 (J.A. 36). From his reincarceration in 2003, he has committed no disciplinary infractions in prison. (J.A. 513).

He has accepted responsibility and expressed remorse for the pain he has caused, for his victims and for his parents. Today he is a different person, he testified. He has changed. (J.A. 486-89). He no family available to take him in. (J.A. 515).  He would like to return to Kentucky, "to find a simple place, sit down and relax, take it easy, drink a good, cold glass of lemonade, eat me a bologna sandwich, and associate myself with good people." (J.A. 495). In seeking a conditional release he is "willing to comply with whatever the courts require." (J.A. 514).

Following commitment, in January 2012, Mr. Barrett entered Butner's sexual offender treatment program. (J.A. 152, 797). The program, called CTP (Commitment and Treatment Program for Sexually Dangerous Persons), is "[n]ot time-based or curriculum-based but task-based with the outcome criteria of reducing sexual dangerousness," according to Andres Hernandez, Psy. D., its clinical coordinator. (J.A. 184). It consists of four phases. Phase I involves evaluation and treatment planning. Phase II entails "a series of activities designed to decriminalize the offender as well as give him basic self-regulation skills." It includes problem solving, conflict resolution, and interpersonal skills. (J.A. 188).

Mr. Barrett performed well in Phases I and II, so well that he was honored with an appointment as a facilitator. Facilitators are peer leaders who convene regular community meetings, help resolve problems, and otherwise serve to welcome and guide the program participants. He held this position for about 25 months. (J.A. 517-18).

He advanced to Phase III on June 30, 2013. (J.A. 153). Phase III involves individual-level examination of the person's sexual offense history, work on perspective-taking, a focus on advanced intimacy skills, and, throughout, the requirement to provide "assertive feedback." (J.A. 206). It was during this phase, around November 2013, according to Dr. Hernandez, that he "began [a] downward spiral." (J.A. 204). Dr. Hernandez said Mr. Barrett had "limited insight" and that

he committed "thinking errors" about domestic violence. He further recalled that during this period Mr. Barrett became "increasingly disengaged in his role as facilitator," and as a result was removed from that role. After "continued disengagement" plus the emergence of "a great deal of mistrust" between Mr. Barrett and the program's administrators, Mr. Barrett was suspended from the program, and as of the date of the second hearing he had not chosen to return. (J.A. 204-08).

To explain this turn, Dr. Harry Hoberman, Ph.D., a government expert, concluded that Mr. Barrett's positive behavior had not been genuine; that it was improperly motivated by the wish to present a good enough profile to be released: "He was totally committed and, then I think when things got hard, it became harder and harder to maintain. . . that approach to treatment." (J.A. 553). This view was shared by Sarah Smithson, a BOP psychologist (she gave deposition testimony, but the government did not call her as a witness). Dr. Smithson, Mr. Barrett's own treating psychologist, said that he had been "fooling" the CTP staff for two years. (J.A. 449).

Meanwhile, based on reports of his substantial progress through Phase II, on August 9, 2013, Mr. Barrett filed the instant petition for conditional release, under 18 U.S.C. § 4247. The timing of his difficulties in the CTP raises at least the

suggestion that the program had begun to retaliate against him for filing the

petition. As Mr. Barrett recalled,

> I was doing just fine until I asked my attorney to apply for a hearing
> for me, and once he did that, that's when everything started coming
> unraveled and that's when Hernandez called me into his office and
> told me I placed more trust in the court system than I did him. That in
> fact, he was the only way out. (J.A. 516).

Upon the filing of the § 4247 petition, there emerged a more scientifically

based explanation for Mr. Barrett's inability to move through Phase III: it came

from Frank Wood, Ph.D., a neuropsychologist.

Dr. Wood was appointed by the court to serve as its independent examiner

for the § 4247 case. He examined Mr. Barrett on three separate occasions in April

2014. (J.A. 666-75). Upon receiving through discovery the BOP's documentation

Mr. Barrett's decline in the treatment program, he asked to conduct further testing.

Upon re-examination, in July 2014, Dr. Wood determined from

neuropsychological testing that the problem was not motivational; rather, the

neurocognitive disorder that he had diagnosed in the first examination had become

much more severe, with significant impacts on memory and abstract reasoning:

> Mr. Barrett's narrative prose memory is now significantly worse than
> in my examinations in April. Then, his memory was at or below the
> second percentile; now, it is far below the 1st percentile both on
> immediate and delayed recall.
>
> On formal testing, Mr. Barrett's vocabulary remains consistent with
> his long-standing 13th percentile level of verbal IQ, but his abstract
> verbal reasoning is now significantly below that level, at the 2nd

> percentile. Similarly, the interview convinced me that he does not
> adequately understand what has been happening in his relationship
> with the CTP; nor does he adequately understand the significance of
> his termination. He interprets his withdrawal as due to his CTP
> participation being "counterproductive," a word repeated so often that
> it implied a well-learned but poorly-understood idea.

(J.A. 677).

These deficits rendered it impossible for him to gain any benefit from the

program. Even by the writing of the first report, Dr. Wood had concluded that "his

current institutional treatment cannot succeed in reducing his dangerousness any

further. That can only be achieved by a highly supervised and well-structured

community based program of treatment and monitoring." (J.A. 667). Questioned

about Dr. Hoberman's report, which reached a less sympathetic conclusion about

Mr. Barrett's behavior, Dr. Wood observed that the report contained "no

assessment of his cognitive ability, at least of his memory, which is an essential

issue." (J.A. 466-67).

As the court's independent examiner, in accordance with this Court's

Standing Order 13-SO-2, Dr. Wood has had no ex parte contact with counsel for

either party. (J.A. 59).

The hearing—what ended up being the first of two hearings—began on

August 14, 2014, and was continued by telephone conference on October 1, 2014.

The key issue to emerge in this hearing was Mr. Barrett's alcohol abuse disorder,

the existence of which was and is uncontested. The court indicated a willingness to

10

grant a conditional release, but it was unsatisfied as of August 14 that the release plan proposed was sufficient to protect the public interest. The judge concluded that he needed to be reassured of the plan's ability to keep Mr. Barrett away from alcohol. The court denied the petition without prejudice, and, provided it were to find jurisdiction, it granted the right to offer a revised release plan. (J.A. 247-56).

On May 12, 2016, Mr. Barrett returned to the court with a revised plan. (J.A. 344). In the interim, his health had taken a turn for the worse. According to Dr. Nicholas Bird, a Duke physician, he had developed severe COPD, the result of "a long history of severe tobacco use and . . . alcohol abuse." (J.A. 404). Mr. Barrett had experienced six exacerbations of his COPD within six months, and he was hospitalized with it for five days in 2014. (J.A. 414). Dr. Bird concluded that Mr. Barrett needed skilled nursing care. (J.A. 711).

Following this assessment, the court granted Mr. Barrett's petition for a $5,125 budget to retain an elder law attorney in Kentucky to help with the placement in a skilled nursing facility. (D.E. #253). The attorney, Ms. Misty Vantrease, investigated the nursing home possibilities in Kentucky. Unable to find one that would admit Mr. Barrett directly from Butner, she expanded her search to the adjacent states of Indiana and Ohio. She received the identical response. (J.A. 361-65). As an alternative, she recommended to the court that he be placed on an interim basis in a residential, 250-bed substance abuse program, The Healing

Place, in Louisville. (J.A. 373-79). She testified that she was "highly confident" that after thirty days she would be able to arrange his transfer to a skilled nursing home. (J.A. 382).

Accordingly, Mr. Barrett proposed The Healing Place as an appropriate facility at the second hearing, incorporating the conditional provisions that had been offered in the first hearing. (J.A. 645). These included GPS monitoring, random drug and alcohol testing, and an outpatient sexual offender treatment in Louisville. (J.A. 280-85). Dr. Wood and Dr. Bird testified that Antabuse and Naltrexone, drugs that operate via different mechanisms to prevent or neutralize the effects of alcohol, are available to lend extra assurance that Mr. Barrett will not drink. (J.A. 124, 408-09, 699). The revised plan also assured the court that Mr. Barrett would be segregated from women and children, because of the way The Healing Place is physically structured. (J.A. 373).

Dr. Bird concluded that "Mr. Barrett has severe COPD with recurrent exacerbations and demonstrates marked limitation in his physical stamina and ability to perform tasks required for independent living." (J.A. 711). Mr. Barrett testified that he only masturbated every month and a half or two months, achieving only a partial erection, and he testified that he had lost interest in sex. (J.A. 168, 495-496). Ms. Vantrease testified that the Medicaid rules in Kentucky would preclude him from having money available to purchase alcohol. (J.A. 361-62). Dr.

12

Wood, given Mr. Barrett's current condition, testified that he was satisfied with Ms. Vantrease's plan. Repeatedly, the judge characterized Dr. Wood an especially credible witness. (J.A. 453, 232, 575).

## SUMMARY OF ARGUMENT

Hobart Barrett presents a situation increasingly common among persons in civil commitment under the Adam Walsh Act as they age: how to provide for their wellbeing when, under sufficient conditions, they no longer pose a public threat under the statute, yet they cannot live independently.

Mr. Barrett's requires round-the-clock nursing care. He suffers from increasing deficits in memory and the ability to think abstractly. His cognitive problems are exacerbated by chronic obstructive pulmonary disease, which deprives his brain of oxygen. He cannot walk unassisted for more than a short distance. He is sexually impaired and no longer interested in sex. His mental deficits interfere with his ability to respond to the sex offender treatment program offered at FCI Butner. At age 70, he is no more of a risk for committing a sexual offense than the average person in society. Since his most recent confinement, in 2003, he has accrued no disciplinary record. He has expressed remorse for his crimes. He wants to spend his remaining days in peace.

Mr. Barrett suffers from alcohol abuse disorder. The district court agreed--or seemed to agree--that he could be conditionally released if surrounded with sufficient control measures to keep him away from alcohol. At the hearings, the lower court was presented with numerous options for conditional release, all of which would involve close supervision of his movement and would preserve the

court's ability to monitor and revoke for noncompliance. The combination was sufficient to assure that Mr. Barrett was no longer sexually dangerous. The court found that it had authority to order conditional release under 18 U.S.C. § 4247. But after two hearings, the court denied the petition.

The viability of Mr. Barrett's proposed release plan was challenged. But the scope of the testimony ranged far beyond the viability of the plan. The court's final decision, rendered orally, was not accompanied by clearly discernible findings of fact, putting appellants' counsel at a loss to conclude what, among a broad range of testimony, constituted the basis of the denial.

Hence, Mr. Barrett requests a remand for more specific findings. In conjunction, he asks this Court to provide the lower court direction in applying constitutional mandates, as well as in using its available authority under its statutory and supervisory powers, as follows:

1. The Court should direct the district court to devise a plan to release Mr. Barrett directly to a skilled nursing facility. This is required to preserve his liberty interest under the Fourteenth Amendment.

2. Alternatively, the Court should direct the lower court to fashion a release based upon in the pending release plan, with the expectation that Mr. Barrett will transfer to a skilled nursing facility within 30 days.

3. The Court should correct a constitutional defect regarding Mr. Barrett's participation in Butner's sex offender treatment program. The lower court apparently agreed that there is no pathway to his release through the program, because he lacks the capacity to participate. The court's denial of conditional release confines Mr. Barrett to commitment without reasonable possibility of effective treatment, violating his constitutional right to treatment.

The Adam Walsh Act's civil commitment scheme is narrowly drawn. Its intention is not humanitarian, but rather to protect the public. The urgent dilemma confronting Mr. Barrett, as will continue to confront Adam Walsh committees, is that their health will eventually degenerate until they cannot possibly pose a danger: by consensus, they will be declared not sexually dangerous. For Mr. Barrett and for those like him without family support, the inability to transition to skilled nursing care raises the real possibility of homelessness. To find that a man will not be sexually dangerous under appropriate conditions, then to refuse to release him on the belief that appropriate conditions are not available, cannot be countenanced under statute or the Constitution.

## ARGUMENT

### *Standard of Review*

In this appeal from a civil bench trial, factual findings are to be reviewed for clear error, legal questions de novo, and mixed questions of law and fact de novo. *QinetiQ US Holdings, Inc. v. Commissioner of Internal Revenue*, ___ F.3d ___, 2017 WL 65555 (4th Cir. 2017).

### I.    THE DISTRICT COURT ERRED BY FAILING TO FIND FACTS SUPPORTING ITS CONCLUSION THAT MR. BARRETT DID NOT PROVE THAT HE WAS ENTITLED TO CONDITIONAL RELEASE, AND THUS THE CASE SHOULD BE REMANDED.

To prevail on his challenge to continued commitment under 18 U.S.C. § 4247, Mr. Barrett must prove by a preponderance of the evidence that he is no longer sexually dangerous. *United States v. Wooden*, 2016 WL 6634920, __ F. Supp. 3d __ (4th Cir. 2016). He is 70 years old. A combination of factors involving his mental and physical health led the court to consider whether he could be released to a setting well enough controlled that he would not pose a public threat of sexual dangerousness: that is, given a specific set of conditions, is it more likely than not that he would not be sexually dangerous. A procedural hurdle was cleared when the court held that it had the right to release Mr. Barrett conditionally under 18 U.S.C. § 4247(h). (J.A. 322-23). Recognizing Mr. Barrett's infirmities, the court identified the issue narrowly: "My goal is to let him try to get out," said the

17

judge at the conclusion of the first hearing. "If I can come up with something that will protect the public I want him out." (J.A. 340, 341).

Not satisfied with the plan proposed in the first hearing, the judge asked Mr. Barrett to return with a more comprehensive plan. This revised plan—the focus of the second hearing—was created with help from Ms. Misty Vantrease, an elder care lawyer in Mr. Barrett's home state of Kentucky, in identifying a placement option. It met the approval of Dr. Frank Wood, a neuropsychologist and the court's independent examiner. The judge again construed the issue narrowly: "[i]t's his [Barrett's] burden to show that he's no longer sexually dangerous with a release plan, under which, he would no longer be sexually dangerous if released in the community." (J.A. 354).

But in the course of the second hearing, testimony was offered on multiple issues, touching upon the degree to which Mr. Barrett's cognitive deficits, or his physical debilities, or a combination, contributed to his sexual dangerousness; his statistical chance of recidivating; the effectiveness of his participation in the Commitment and Treatment Program for Sexually Dangerous Persons ("CTP") (Butner's sex offender treatment program); as well as the adequacy of the constraints specified in the proposed release plan.

Ruling from the bench, the judge denied the petition. (J.A. 658). In so doing, he failed to make specific findings of fact in accordance with Fed. R. Civ. P. 52(a),

frustrating appellate review. Compliance with Rule 52(a) ensures findings

"'sufficient to indicate the factual basis for the court's general conclusion as to

ultimate facts' so as to facilitate a 'meaningful review' of the issues presented."

*Wolfe v. New Mexico Dept. of Human Services*, 69 F.3d 1081, 1087 (10th Cir.

1995) (citation omitted).

In his brief concluding remarks, the judge indicated that he found the

conditions of the proposed release plan not strict enough. ("[Secure] means that if

somebody wants to leave, they can leave." (J.A. 312).) There is also evidence that

he found Mr. Barrett's degree of dangerousness to be greater than he had believed

after the first hearing ("I keep thinking about the word 'control'. . . He has these

disorders, and all the experts agree the disorders are there. . . The answer is not to

put him back in society." (J.A. 315).), which is consistent with his remark earlier in

the second hearing that he believed the scope of the question had broadened

("Since that [telephone conference 10/01/14] I've received substantially more

reports, from the Government and so forth, so we're talking about the whole

thing." (J.A. 453).) In contravention of the statute, he also expressed the belief that

Mr. Barrett would be better off remaining in government custody, even if his

physical condition were such that he could be conditionally released. ("I don't

know if he's better off there or better off here." (J.A. 314).) Further, the judge

apparently stated that Dr. Wood had testified that Mr. Barrett would benefit from

continued participation in the CTP, when Dr. Wood said the opposite. ("[Dr. Wood] made some strong and important recommendations. . . [H]e thought Mr. Barrett should be involved in sex offender approved treatment." (J.A. 332-33). *Cf.* Dr. Wood: "He's not capable of participating in the kind of sex offender therapy that is given at the Bureau of Prisons." (J.A. 447).)

Coming at the end of a lengthy hearing, in which conflicting testimony from multiple witnesses spoke to the various issues identified above, the court's holding was not supported by findings of fact sufficient to explain its rationale.

Failure to provide findings of fact under Rule 52(a) "has been called a dereliction of duty," *Seattle Box Co., Inc. v. Industrial Crating and Packing, Inc.*, 756 F.2d 1574, 1578 (Fed. Cir. 1985). "When the record presents alternative interpretations, the task should not be imposed upon the appellate court of picking and choosing those findings which seem to it preferable." *United States v. Hollis*, 424 F.2d 188, 192 (4th Cir. 1970). The case should be remanded for more explicit findings of the facts on which the court held that Mr. Barrett did not meet his burden of proof for conditional release, with the ability of the parties to supplement the record as desired.

On rehearing, moreover, this Court should direct the lower court to be guided by the following principles.

## II.    MR. BARRETT'S LIBERTY INTEREST SHOULD COMPEL THIS COURT TO DIRECT THE DISTRICT COURT TO PLACE HIM DIRECTLY IN SKILLED NURSING CARE.

Given his age and disabilities, Mr. Barrett requires skilled nursing care. Such was the opinion of his medical expert, the court's neuropsychological examiner, and the government's forensic/clinical psychological expert. Indeed, in authorizing a budget for Ms. Vantrease to look for a nursing home, the court signaled an expectation that she could find one, with the anticipated end of creating a plan under which Mr. Barrett could be released to it within the terms of the statute. Denying him this outcome constitutes a violation of his personal liberty interest. This Court should direct the lower court to devise a placement for him in a skilled nursing facility.

Dr. Nicholas Bird, a physician who examined Mr. Barrett and studied his medical records, concluded that he suffered from chronic obstructive pulmonary disease serious enough to require skilled nursing care. (J.A. 711). Dr. Bird cited six "exacerbations" (serious incidents) plus one hospitalization. (J.A. 414). From medical records, Dr. Bird cited increasing difficulties with activities of daily living as well as an increasing risk of falling; his stamina, his ability to walk short distances, is very limited. (J.A. 419). Dr. Bird prognosticates that he will require home oxygen as his condition declines. Based on statistics of life expectancies for people with severe COPD, Dr. Bird in 2014 assigned him a 50 percent four-year

21

mortality rate, which, by the time of the hearing, translated to two years. "It is only going to remain at this level of severity and worsen," he said. (J.A. 429). Dr. Wood noted that progressive COPD "invariably impairs cognition," with a marked impact on memory; and that this "is one of the factors that explains his cognitive deficits." (J.A. 439, 404). He agreed that Mr. Barrett belongs in skilled nursing. (J.A. 461).

Dr. Harry Hoberman, the government's psychological expert, also concluded that the appropriate placement for Mr. Barrett was in skilled nursing. In his report dated February 8, 2016--conducted between the first and second hearings--he stated that "it seems unreasonable to consider that Mr. Barrett should reside outside of a secure nursing home setting." (J.A. 783). He came to this conclusion even without the benefit of reading the reports from Dr. Bird or Dr. Wood. (J.A. 531-32).

But despite her best efforts, Ms. Vantrease could find no skilled nursing facility willing to accept a placement directly from a prison. (J.A. 363-65). The clearest understanding of the issue at the crux of this case is that, if surrounded with well secured skilled nursing care, Mr. Barrett meets the statutory standard for release; and yet he cannot be released, because no skilled nursing facility will accept him. (J.A. 363-65).

This dilemma presents a constitutional issue. "Freedom from imprisonment--from government custody, detention, or other forms of physical restraint--lies at the

heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. INS*, 533

U.S. 678, 690 (2001). "In our society, liberty is the norm, and detention . . . without

trial is the carefully limited exception." *Foucha v. Louisiana*, 504 U.S. 71, 83 (1992)

(internal quotation omitted). The Adam Walsh Act is not a humanitarian statute. Its

limited purpose is to confine the "sexually dangerous" until they are "no longer

sexually dangerous to others, or will not be sexually dangerous to others if released

under a prescribed regimen of medical, psychiatric, or psychological care or

treatment." 18 U.S.C. § 4248(d). Civil commitment can be justified only under a

compelling state interest, *Reno v. Flores*, 507 U.S. 292, 316 (1993) (O'Connor., J.,

concurring), citing *United States v. Salerno*, 481 U.S. 739, 748 (1987), and the single

state interest that justifies Adam Walsh Act commitment is protecting the public from

sexually dangerous persons. Confinement must end when its justification ends.

The lower court should be instructed that Mr. Barrett's liberty interest

demands that the court find him placement in a skilled nursing facility. Just as the

court found that it possessed the authority to fashion and order conditional release

under 18 U.S.C. § 4247, the court should be instructed to take advantage of related

statutory tools. Using 18 U.S.C. § 4248(e)(2)(B), the district court could order

compliance with the terms of the release; and at any future time it would be

empowered to modify the terms of the release. *Id*. Following 18 U.S.C. § 4248(f),

the court would be able to revoke the discharge and even to arrest Mr. Barrett upon probable cause to believe he is not complying with its terms.

The Bureau of Prisons should take the lead in finding the solution, for reasons well articulated by Judge David Bazelon in *Lake v. Cameron*, 364 F.2d 657 (D.C. App. 1966). There an elderly, senile, and indigent woman protested her commitment. Using the power available under D.C. mental health law, Judge Bazelon directed the lower court to fashion a solution that might well involve placing her in a nursing facility. In so doing, he made it the government's burden to explore the alternatives, on the basis of its superior resources, while pointing out that "[p]roceedings involving the care and treatment of the mentally ill are not strictly adversary proceedings." 364 F.2d at 660-61. Nor should the process be adversary in this case. The government should bear the burden of finding a skilled nursing solution, and the BOP should cooperate fully in the effort.

To assist in enforcing the release plan, this Court should instruct the lower court to engage the United States Probation Office. The government persuasively argued for such a strategy in its brief of September 12, 2014:

> Title 18 U.S.C. § 3603 sets forth various duties that United States probation officers are statutorily mandated to perform, including supervision of probationers, persons on supervised release, and those conditionally released from their commitments under 18 U.S.C. § 4243 or 4246. While § 3503 does not specify whether probation officers may supervise persons conditionally released under 18 U.S.C. § 4247(h) or 4248(e), the statute requires probation officers

24

to "perform any other duty that the court may designate. 18 U.S.C. § 3603(10). (J.A. 263-64).

Mr. Barrett agrees with the government's conclusion that "a court may order the United States Probation Office to supervise a person ordered conditionally discharged under § 4247(h)." *Id*. Such an arrangement, combined with the authority to revoke the release, offers adequate assurance of the court's ability to successfully monitor and control Mr. Barrett's status.

Further, the broader context of Mr. Barrett's dilemma underscores the urgency of his petition. A useful analogy can be drawn from the way the federal prison system is dealing with a steadily increasing number of ill and aging prisoners, which has given rise to a major policy issue.[1] The Department of Justice has responded by providing for compassionate release in the form of medical and geriatric parole. 28 C.F.R. § 2.77 (medical parole); 28 C.F.R. § 2.78 (geriatric parole).[2] These regulations recognize that, with respect to persons whose age and infirmities place them within the categories identified, no public purpose justifies

---

[1] *See, e.g.*, Martina E. Cartwright, "The Silver Tsunami: Aging Prisoners, Early Release, Guardianship and Prisoner Advocate Initiatives for Long Term Care Beyond the Prison Walls," Journal of Aging, Longevity, Law, and Policy (2016): Vol. 1: Iss. 1, Article 6, available at http://digitalcommons.tourolaw.edu/jallp/vol1/iss1/6.

[2] For a recent discussion of these provisions, *see* Statement of Michael E. Horowitz, Inspector General, U.S. Department of Justice, before the United States Sentencing Commission hearing on "Compassionate Release and the Conditions of Supervision," 17 Feb. 2016, available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20160217/IG.pdf/.

their continued confinement behind prison walls. State governments are reaching the same conclusion; the state of Connecticut has contracted with a private party to establish a nursing facility specifically for qualifying prisoners.[3]

If people serving active time for crimes are entitled to compassionate release because their weakening physical condition, surely one who has completed his sentence and is civilly confined under the Adam Walsh Act is deserving of the same remedy. In devising a solution for Mr. Barrett, this Court should bear the rationale of those programs in mind.

Should cost become an issue, the district court should be reminded that "vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963).

---

[3] Tina Maschi, *et al.*, "Analysis of United States Compassionate and Geriatric Release Laws: Towards a Rights-Based Response for Diverse Elders and Their Families and Communities," Fordham University, Evidence Press (2015), available at https://www.prisonlegalnews.org/news/publications/analysis-united-states-compassionate-and-geriatric-release-laws-be-evidence-press-2015/. Christine Vestal "For Aging Inmates, Care Outside Prison Walls," Stateline, Pew Charitable Trust (Aug. 12, 2014), available at http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2014/08/12/for-aging-inmates-care-outside-prison-walls/.

## III.   ALTERNATIVELY, THIS COURT SHOULD DIRECT THE DISTRICT COURT TO FASHION A RELEASE CONSISTENT WITH THE PLAN MR. BARRETT PROPOSED.

Alternatively, this Court should remand the case with the direction to implement the conditional release plan that Mr. Barrett proposed, as revised in the second hearing. The controls and constraints incorporated, combined with the court's inherent supervisory powers, are sufficient to protect the public interest.

Ms. Vantrease testified that The Healing Place, in Louisville, Kentucky, is willing to accept Mr. Barrett. (J.A. 373-74). The Healing Place is large residential substance abuse treatment facility offering a structured recovery program. The facility is segregated by gender; he would not be in a unit with women or children. According to uncontested medical testimony, his physical limitations would make it extremely difficult for him to leave the facility on his own volition. A sex offender treatment program is available in Louisville. The court could order that Mr. Barrett be confined to The Healing Place, with controlled visits only to the sex offender treatment program and/or to a church of his choice, and it could reinforce this order with GPS monitoring. These institutional controls would provide ample restriction to satisfy the court's interest in protecting the public.

Dr. Bird testified to the efficacy of two different drugs to control his intake of alcohol: Antabuse, a drug in use for many years that will make the person sick if they drink after taking it; or Naltrexone, which neutralizes alcohol's pleasurable

effect. Use of either drug was proposed as an extra safeguard, to be administered on the unlikely chance that Mr. Barrett should have an opportunity to drink.

Further, according to Dr. Wood's testimony, Mr. Barrett's statistical likelihood of recidivating is "below what the general risk in the general population is. You probably have a greater likelihood of anybody committing a sex crime than there is of a 70-year-old recidivating." (J.A. 100). Adam Walsh Act confinements must distinguish a "dangerous sexual offender [with a] serious mental illness, abnormality, or disorder" from "the dangerous but typical recidivist convicted in an ordinary criminal case." *Kansas v. Crane*, 534 U.S. 407, 412-13 (2002), citing *Kansas v. Hendricks*, 521 U.S. 346, 360 (1997). Mr. Barrett is statistically in the latter category. Dr. Wood's assignment of such a negligible recidivation risk reinforces the conclusion that he should be released, and that the proposed plan provides more than adequate assurance against his potential dangerousness.

Recognizing that the most appropriate place for Mr. Barrett is in skilled nursing, the proposed plan anticipates that he would soon be moved to such a facility. Ms. Vantrease testified that she was "highly confident" she could get him placed in a skilled nursing facility with thirty days. (J.A. 382). She further said she knows of no skilled nursing facility that serves alcohol. Nonetheless, she noted that a number of the nursing homes in Kentucky are in dry counties. (J.A. 397). The court could require that the facility be in a dry county.

This Court should remind the district court that it has the power to dictate all the terms of the release plan through an order tailored to its specific concerns. As outlined in the previous section, the statutory are tools available. The local Kentucky probation office is available to lend support, including oversight of GPS monitoring. (J.A. 782, 100). According to Ms. Vantrease's testimony, placement requests accompanied by court order get highest priority; and The Healing Place normally alerts the court of any violation. (J.A. 379).

The order can be can be flexibly structured to give the court the authority to modify, as well as enforce, the terms of the release. In response to the court's concern that Mr. Barrett might be dismissed from The Healing Place for not cooperating with its treatment program, the answer is not, as the court speculated, that "they'd probably kick him out and, then he'd be on the streets" (J.A. 601), but that the court would have the authority to revoke the release, send Mr. Barrett back into confinement, or even, if probable cause warrants, have him rearrested, as discussed in sec. II above.

The court, in summary, possessed all the tools it needed to have devised and ordered an appropriate conditional release plan. Should this Court not find in Mr. Barrett's favor on the constitutional argument urged in sec. II above, it should require upon remand that the court order a release plan consistent with the plan offered at the first hearing with its revisions proposed on May 12, 2016.

**IV.    THIS COURT SHOULD INSTRUCT THE COURT THAT MR. BARRETT'S CONTINUED CONFINEMENT VIOLATES HIS LIBERTY INTEREST BECAUSE IT OFFERS NO PATHWAY TO RELEASE THROUGH THE CTP.**

An Adam Walsh Act commitment facility must maintain a sex offender treatment program to "assist the individual in overcoming a psychological or physical dependence or any condition that makes the individual dangerous to others." 18 U.S.C. §§ 4247(a)(C), (e)(2). Before the commitment, the government must "consider the suitability of the facility's rehabilitation programs in meeting the needs of the person." § 4247(i)(C). At Butner, the CTP fulfills the statutory mandate for a sex offender treatment program. But Mr. Barrett's treatment had ceased to be effective before the hearing began. Because effective treatment is no longer possible, keeping him in confinement contravenes the statute and abridges his liberty interest.

"At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) (persons committed as incompetent to stand trial may be confined only as long as progress toward competency is made). Without effective treatment, no rational relation exists between one of the asserted justifications for confining people under the Adam Walsh Act and the nature of that confinement. *See Flakes v. Percy*, 511 F. Supp. 1325, 1337 (W.D. Wisc. 1981). In recognizing the right to psychiatric treatment for the incarcerated, the Fourth Circuit has acknowledged the potential constitutional

right to treatment in civil commitment. *Bowring v. Godwin*, 551 F.2d 44 n.3 (4th Cir. 1977). *Bowring* was followed in the context of sex offender treatment by *Ohlinger v. Watson*, 652 F.2d 775 (9th Cir. 1981) (offenders with indeterminate life sentences entitled to individualized treatment).

Other courts have held that civil committees under the government's police power hold a liberty interest in adequate treatment. *See, e.g.*, *Stachulak v. Coughlin*, 364 F. Supp. 686 (N.D. Ill. 1973) (right to treatment under Illinois sexual offender law), *Eckhart v. Hensley*, 475 F. Supp. 908 (W.D. Mo. 1979) (treatment must address aspect of behavior behind person's dangerous traits).[4]

Dr. Wood offered the opinion that Mr. Barrett could not benefit from further treatment. (J.A. 66-67, 115). Mr. Barrett's participation ceased during Phase III of the four-phase program. (J.A. 204-08). As explained by Andres Hernandez, the program's director, Phase III involves advanced, integrative thinking. (J.A. 190). It was precisely the intellectual challenge of this new level of treatment, in Dr. Wood's opinion, that Mr. Barrett could not meet. (J.A. 447-48). Dr. Wood's diagnostic testing indicated that Mr. Barrett has difficulties with abstract thinking,

---

[4] This line of cases stems from the landmark *Wyatt v. Stickney*, 325 F. Supp. 781 (M.D. Ala. 1971), aff'd in part, rev'd and remanded in part sub nom. *Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974), the first case to identify a constitutional right to treatment. Judge Frank Johnson described the basis for the right as follows: "To deprive any citizen of his or her liberty upon the altruistic theory that the confinement is for humane therapeutic reasons and then fail to provide adequate treatment violates the very fundamentals of due process." 325 F. Supp. at 785.

as well as memory. (J.A. 73-77). "He's not capable of participating in the kind of sex offender therapy that is given at the Bureau of Prisons, which is a rather high level, rather intellectual, rather intense point-to-point in time, sort of, treatment." (J.A. 447). No other witness had administered neurological testing to Mr. Barrett. A further barrier to treatment was the distrust that had emerged between Mr. Barrett and the treatment providers; as Logan Graddy, M.D., expert witness for the government, put it, Mr. Barrett "had made up his mind he was not going to participate any more, then, the treatment team, kind of, made up their minds, well, he's just a bad guy."[5] (J.A. 597).

The judge appears to have agreed with Dr. Wood that there was "no chance he could complete CTP" (J.A. 474). "I'm not worried about CTP," the judge said near the end of the hearing (J.A. 579), as if agreeing that it was ineffective. The court appears to have ordered Mr. Barrett to remain in confinement despite a lack of available effective treatment. Thus the petition's denial ignores the statute's requirement for a rehabilitation program suitable to Mr. Barrett's individual needs, and confinement without such a program violates his liberty interest.

---

[5] As noted in the Statement of Facts above, the timing of the CTP staff's rather abrupt change of position on Mr. Barrett's progress raises at least an inference of a factual issue about the motivation of the treatment providers.

Alternatively, the record is unclear whether the judge found that treatment would be effective or not, and on that basis, this Court should direct the court to reconsider the question upon remand, with this constitutional framework as guidance.

## CONCLUSION

This case presents this Court with constitutional as well as statutory questions regarding the implementation of the Adam Walsh Act. Primarily, it requires the court to address a gap in the statute: the statute's failure to accommodate for the release of those civilly committed when their health deteriorates to the point at which they cannot care for themselves. If released under an appropriately conditioned plan, Mr. Barrett poses no danger of sexually reoffending. The inability to transfer him directly to a skilled nursing facility, or to an interim facility from which he can soon be placed in skilled nursing, frustrates any reasonable solution to the deprivation of his liberty interest that his continued confinement would impose. This Court must correct this injustice.

In upholding the Adam Walsh Act under the Necessary and Proper clause of the Constitution, the Supreme Court in *United States v. Comstock*, 560 U.S. 126, 127 (2010), observed that the Act represents only "a modest addition to a longstanding federal statutory framework" for accommodating federal prisoners who suffer mental illness. In interpreting those related statutes, courts have recognized essential constitutional interests, including the right to effective treatment. These holdings, in turn, reflect a long-standing understanding that civil commitment constitutes a "massive curtailment of liberty." *Humphrey v. Cady*, 405 U.S. 594, 509 (1972).

> The right to restrain an insane person of his liberty is found in that great law of humanity, which makes it necessary to confine those whose going at large would be dangerous to themselves or others . . . And the necessity which creates the law, creates the limitation of the law. The questions must then arise in each particular case, whether a patient's own safety, or that of others, requires that he should be restrained for a certain time, and whether restraint is necessary for his restoration or will be conducive thereto. The restraint can continue as long as the necessity continues. This is the limitation, and the proper limitation.

*Matter of Josiah Oakes*, 8 Law Rep. 123, 125 (Sup. Ct. of Mass., 1845), quoted in

*Lynch v. Baxley*, 386 F. Supp. 378, 389-90 (M.D. Ala. 1974).

For all of the reasons argued above, Mr. Barrett respectfully asks this Court to order a rehearing of his petition for conditional release under 18 U.S.C. § 4247.

LAWRENCE H. BRENNER
Brenner & Brenner, P.A.

/s/ Lawrence H. Brenner
Lawrence H. Brenner
P. O. Box 787
Carrboro, NC 27510
(252) 349-0662

*Counsel for Appellant*

35

## REQUEST FOR ORAL ARGUMENT

Because this case involves review of a factually detailed record, and because this case presents the Court with an opportunity to consider important constitutional questions under 18 U.S.C. §§ 4248 and 4247, Mr. Barrett believes that oral argument would be useful. Accordingly, he requests oral argument.

Respectfully submitted this 19th day of January, 2017.

LAWRENCE H. BRENNER
Brenner & Brenner, P.A.

/s/ Lawrence H. Brenner
Lawrence H. Brenner
P. O. Box 787
Carrboro, NC 27510
(252) 349-0662

*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because, excluding the

parts of the document exempted by Fed. R. App. R. 32(f) (cover page,

disclosure statement, table of contents, table of citations, statement regarding

oral argument, signature block, certificates of counsel, addendum,

attachments):

this document contains 7,601 words.

2.    This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface

using Microsoft Word in 14 point Times New Roman.

Dated:  January 19, 2017         /s/ Lawrence H. Brenner
                                 Lawrence H. Brenner

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on January 19, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all the registered CM/ECF users.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Karen R. Taylor
Karen R. Taylor
GIBSON MOORE APPELLATE SERVICES, LLC
P.O. Box 1460
Richmond, VA  23218
(804) 249-7770
karen@gibsonmoore.net
